[No. E049899. Fourth Dist., Div. Two. Feb. 16, 2011.]

JERID ROSENCRANS et al., Plaintiffs and Appellants, v.
DOVER IMAGES, LTD., Defendant and Respondent.

## Counsel

Perona, Langer, Beck, Serbin & Mendoza, Ronald Beck and Ellen R. Serbin for Plaintiffs and Appellants.

Gilbert, Kelly, Crowley & Jennett, Peter J. Godfrey and Timothy W. Kenna for Defendant and Respondent.

## OPINION

**MILLER, J.**—Plaintiffs and appellants Jerid and Amy Rosencrans (plaintiffs) sued defendant and respondent Dover Images, Ltd. (Dover), for (1) negligence; (2) negligent training and supervision; and (3) loss of consortium. The trial court granted Dover's motion for summary judgment as to all of the causes of action. Plaintiffs contend that the trial court erred by granting summary judgment because they presented triable issues of fact. We affirm in part, and reverse in part.

## FACTUAL AND PROCEDURAL HISTORY

### A. *Facts*

Dover does business as Starwest Motocross, and operates a motocross track known as Starwest Motocross Track (the track). The track is located at the Lake Perris Fairgrounds in Perris. On June 17, 2007, at the time of the incident in this case, the track's length was 0.6 of a mile. Before entering the track facility, patrons were required to stop their cars at a booth that was staffed by a Starwest employee. At the booth, while the patron was in his or her car, the patron paid a fee and signed a release and waiver of liability.

Jerid Rosencrans (Jerid)[1] had been riding motorcycles since he was 14 years old; on June 17, 2007, Jerid was 38 years old. On June 17, 2007, at 7:00 or 7:30 p.m., Jerid arrived at the track. He was driving his truck, with his motorcycle in the truck's bed. Jerid stopped his truck at the entrance booth at the Starwest facility. The Starwest employee in the booth gave Jerid a clipboard with the release document and said, " 'Here, just sign in,' " or " 'Here, sign this.' "

The document was titled, "Release and Waiver of Liability Assumption of Risk and Indemnity Agreement" (the Release), and underneath the title were approximately nine paragraphs. The paragraphs set forth the waiver and release. For example, one of the paragraphs read: "2. Hereby releases, waives, discharges and covenants not to sue the owner of the Premises, any individual engaging in the Activities, rescue personnel, and the Premises inspectors, surveyors, underwriters, consultants and others who give recommendations, directions or instructions or engage in risk evaluation or loss control activities regarding the Premises, and each of them, their directors, officers, agents and employees[,] from all liability to the Undersigned for any and all loss or damage and any claim or demands therefore on account of

---

[1] For the sake of clarity and intending no disrespect, we refer to Jerid Rosencrans by his first name. (See *Estate of Hastie* (2010) 186 Cal.App.4th 1285, 1290, fn. 2 [112 Cal.Rptr.3d 664].)

injury to the person or property or resulting in death of the Undersigned arising out of or related to the use of the Premises for the Activities, whether caused by the negligence of the Releasees or otherwise."

Underneath the paragraphs were multiple horizontal lines, separated into four columns, where patrons can print and sign their names. In the section where patrons signed their names, they were required to sign their name over the words "I have read this release." The following illustrates the signature portion of the document:

| "Print Name Here | Sign Name Here | Witness | Date |
|---|---|---|---|
| " _____ | I HAVE READ THIS RELEASE | _____ | _____ |
| " _____ | I HAVE READ THIS RELEASE | _____ | _____ |
| " _____ | I HAVE READ THIS RELEASE | _____ | _____ " |

On the Release, Jerid printed his name, and signed his name over the words "I HAVE READ THIS RELEASE." Jerid signed the Release within approximately 10 seconds of the document being handed to him. Jerid was not given a copy of the Release that he signed. The total exchange at the entrance booth lasted approximately 30 seconds.

Approximately 20 other motocross riders were practicing on the track when Jerid arrived—there was not a race occurring at the track. Jerid put on his goggles, helmet, and chest protector, and proceeded to ride his motorcycle on the track. Jerid had been riding on the track for approximately 30 minutes when he went up a ramp for a jump and fell, landing on the downslope of the ramp, which placed him outside of the view of the other riders. Jerid was not hurt, and proceeded to stand and pick up his motorcycle. Approximately 30 seconds later, a motorcyclist on the track struck Jerid. Approximately 20 seconds after that collision, a second motorcyclist struck Jerid. Jerid's complaint alleges that the collisions caused him to suffer "serious and severe injuries."[2]

Jerid's initial fall took place near a platform where a person employed as a "caution flagger" would typically stand. From the platform, a "caution flagger" can see riders who have fallen down, and then alert other riders, who are unable to see fallen motorcyclists, that there is a fallen motorcyclist on the track. There was at least one caution flagger at the track when Jerid fell; however, at the time of the fall, the caution flagger was not on the platform near the location where Jerid fell. Jerid saw a caution flagger on the far side

---

[2] It is not clear exactly what injuries, if any, Jerid sustained. The "Facts" section of plaintiffs' opening brief reflects that Jerid was "injured"; however, it does not reflect the extent of the injuries or the type of injuries sustained. We have reviewed Jerid's declaration, and the portions of Jerid's deposition transcription that are included in the record; neither document reflects the extent of Jerid's injuries nor the type of injuries sustained.

of the track from where he fell, and he saw the caution flagger run towards him prior to being struck by the second motorcyclist.

### B. *Procedural History*

#### 1. *Complaint*

Plaintiffs alleged three causes of action against Dover. First, Jerid alleged Dover "negligently owned, operated, maintained and/or controlled" the track. Second, Jerid alleged Dover failed to adequately supervise and train its employees. Third, Jerid's wife alleged the foregoing negligent acts caused her to be deprived of Jerid's support, love, care, companionship, and sexual relations.

#### 2. *Motion for Summary Judgment*

Dover moved for summary judgment. In regard to the first and second causes of action, Dover asserted Jerid's claim was barred by Jerid's execution of the Release. In regard to the loss of consortium cause of action, Dover argued the claim was barred because it was derivative of the barred first and second causes of action.

#### 3. *Opposition to the Motion for Summary Judgment*

Plaintiffs opposed Dover's motion for summary judgment. First, plaintiffs asserted the Release could be found to be unenforceable because (1) the Dover employee at the booth represented the document was a sign-in sheet; (2) the Release was written in a small font; (3) Dover never informed Jerid he was signing a release; (4) Jerid did not know he was signing a release; (5) the title of the document was obscured by the clipboard's metal clip; (6) Dover did not give Jerid a copy of the Release; and (7) there was insufficient time for Jerid to read the Release while stopped at the entrance booth. Plaintiffs argued the foregoing evidence showed that Jerid may not have freely entered into the Release, which would create a triable issue of fact as to whether the Release was void.

Second, plaintiffs argued that even if the Release were enforceable, it could not bar a claim for gross negligence. Plaintiffs asserted that they produced evidence creating a triable issue of fact for gross negligence on the part of Dover. Specifically, plaintiffs argued (1) Dover had "a duty to have caution flaggers at a permanent station"; (2) Dover failed to place a caution flagger at the platform near the site of Jerid's fall; and (3) a caution flagger did not warn other motorcyclists that Jerid had fallen on the track for approximately 30 seconds.

Additionally, plaintiffs argued there was evidence Dover was grossly negligent in its hiring and supervising of employees. Plaintiffs asserted their expert declared that Jerid's "injuries were caused by caution flaggers who were not properly trained or supervised." Plaintiffs argued that since the negligence claims were viable, the loss of consortium claim was also viable.

### 4. Reply to the Opposition to the Motion for Summary Judgment

Dover replied to plaintiffs' opposition to the motion for summary judgment. First, Dover argued the Release was enforceable. Dover argued that even if the employee referred to the Release as a "sign-in sheet," then plaintiffs failed to show any reliance on the misrepresentation; for example, plaintiffs did not show Jerid would not have ridden at the track if he had been aware of the language of the Release. Additionally, Dover argued plaintiffs failed to provide evidence that Dover's conduct rose to the level of gross negligence. Alternatively, Dover argued plaintiffs' claims were barred by the assumption of the risk doctrine, because Jerid assumed the risk of being injured by participating in the sport of motocross. Finally, Dover argued plaintiffs failed to provide proof that Dover's employees were inadequately trained and supervised.

### 5. Ruling on the Motion for Summary Judgment

The trial court granted Dover's motion for summary judgment. The trial court's decision was separated into four parts. First, the trial court concluded the Release was enforceable, and therefore the first and second causes of actions were barred by the Release. Second, the trial court held the undisputed facts showed that Dover's conduct did not rise to the level of gross negligence. Third, the trial court concluded Jerid assumed the risk of being injured when he participated in the sport of motocross. Fourth, the trial court held the loss of consortium cause of action was derivative of the negligence causes of action and, therefore, it too failed as a matter of law.

## DISCUSSION

### A. Enforceability of the Release

In Dover's motion for summary judgment, it cited the Release as an affirmative defense. The trial court found in favor of Dover. Plaintiffs contend they raised a triable issue of fact regarding whether the Release was void. Plaintiffs assert they produced evidence showing that Jerid was not aware that he was signing a waiver and release of his rights. Specifically, plaintiffs assert the Release was void due to the legal principle of "fraud in the execution." We disagree.

"Fraud in the execution" means that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all; since mutual assent is lacking, the contract is void. (*Duffens v. Valenti* (2008) 161 Cal.App.4th 434, 449 [74 Cal.Rptr.3d 311].) However, a contract will not be "considered void due to the fraud if the plaintiff had a reasonable opportunity to discover the true terms of the contract. The contract is only considered void when the plaintiff's failure to discover the true nature of the document executed was without negligence on the plaintiff's part. [Citation.] [¶] This issue usually arises when the plaintiff failed to read the terms of the contract, relying instead on the defendant's representation as to the effect of the contract. Generally, it is not reasonable to fail to read a contract; this is true even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract. [Citation.] Reasonable diligence requires a party to read a contract before signing it. [Citation.]" (*Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938, 958–959 [85 Cal.Rptr.3d 817], italics omitted.)

Jerid testified that he can read English and that he attended college. The Dover employee gave Jerid the Release before he entered the Starwest facility, and said, " 'Here, just sign in,' " or " 'Here, sign this.' " Jerid was in his truck at the time he was given the Release to sign. There were approximately 10 cars in line behind Jerid. The foregoing evidence reflects that Jerid was given an opportunity to read the terms of the agreement. Jerid could have read the Release while in line, or he could have moved his truck to the side and read the Release. There is nothing indicating that Jerid was forced to sign the Release or that he was somehow denied an opportunity to read the Release before signing it. Consequently, we conclude that Jerid had a reasonable opportunity to discover the true terms of the contract. Jerid's failure to read the Release was due to his own negligence, because the evidence indicates that there was nothing preventing him from reading the Release. In sum, the Release is not void due to fraud in the execution.

Plaintiffs assert that Jerid did not "freely and knowingly" enter into the Release because (1) the Dover employee represented the Release was a sign-in sheet; (2) the metal clip of the clipboard obscured the title of the document; (3) the Release was written in a small font; (4) Dover did not inform Jerid he was releasing his rights by signing the Release; (5) Jerid did not know he was signing a release; (6) Jerid did not receive a copy of the Release; and (7) Jerid was not given adequate time to read or understand the Release.

We do not find plaintiffs' argument persuasive because, as set forth *ante*, there was nothing preventing Jerid from reading the Release. There is nothing indicating that Jerid was prevented from (1) reading the Release while he sat

at the booth, or (2) taking the Release, moving his truck out of the line, and reading the Release. In sum, plaintiffs' arguments do not persuade us that Jerid was denied a reasonable opportunity to discover the true terms of the contract.

## B. *Release as an Affirmative Defense*

The Release provides that Jerid agreed to waive his right to sue Starwest for any losses or damages suffered on account of an injury related to using the track, "whether caused by the negligence of [Starwest] or otherwise." Based upon the plain language of the Release, we conclude that Jerid waived his right to sue Dover for ordinary negligence as well as negligent hiring and supervision.[3] (See *Griffin Dewatering Corp. v. Northern Ins. Co. of New York* (2009) 176 Cal.App.4th 172, 204 [97 Cal.Rptr.3d 568] [plain language is an important principle of contract interpretation].)

## C. *Gross Negligence*

Plaintiffs contend the trial court erred by granting Dover's motion for summary judgment because there are triable issues of fact related to the allegation of gross negligence. We agree.

### 1. *The Release*

We briefly explain why gross negligence is exempt from the Release. California cases have long held that liability for ordinary negligence may be released; however, gross negligence has been distinguished—"no published California case has upheld . . . an agreement purporting to release liability for future gross negligence." (*Santa Barbara, supra*, 41 Cal.4th at pp. 758, 777, italics omitted.) Our Supreme Court has specifically concluded "that an agreement made in the context of sports or recreational programs or services, purporting to release liability for future gross negligence, generally is unen-forceable as a matter of public policy." (*Id.* at p. 751.) Thus, while plaintiffs' claims for ordinary negligence are barred by the Release, their claim for gross negligence would not be barred by the Release due to public policy concerns.

---

[3] "California courts have invalidated releases of liability for future ordinary negligence . . . when . . . the court determines that a particular release concerns a service that transcends a purely private agreement and affects the public interest." (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 757 [62 Cal.Rptr.3d 527, 161 P.3d 1095], italics omitted (*Santa Barbara*).) Plaintiffs have not argued that the Release is invalid because it released future liability for ordinary negligence. Typically "courts have upheld releases of liability concerning ordinary negligence related to . . . auto and motorcycle racing events . . . ." (*Id.* at p. 759, fns. omitted.) Consequently, since the issue was not raised, and law typically holds that the recreational sport releases are valid, we assume that this issue is not applicable to the Release.

## 2. *Triable Issue of Fact*

■ Gross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages. (*Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1541 [5 Cal.Rptr.3d 835].) However, to set forth a claim for "gross negligence" the plaintiff must allege extreme conduct on the part of the defendant. (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185–1186 [7 Cal.Rptr.3d 552, 80 P.3d 656] (*Eastburn*).) The conduct alleged must rise to the level of "either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' [Citations.]" (*Santa Barbara, supra*, 41 Cal.4th at p. 754, fn. omitted.)

### (a) *Duty*

■ Whether a duty exists is a legal question, which is decided by the court, rather than the trier of fact. (*Souza v. Squaw Valley Ski Corp.* (2006) 138 Cal.App.4th 262, 266 [41 Cal.Rptr.3d 389].) As a general rule, people have a duty to use due care to avoid injuring others. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 315 [11 Cal.Rptr.2d 2, 834 P.2d 696].) However, dangerous conduct or conditions are often an integral part of participating in sports (*ibid.*); therefore, when a plaintiff is injured while participating in a dangerous sport, the duty analysis becomes intertwined with an exception to the general duty of care rule known as "assumption of the risk." The "assumption of the risk" doctrine provides an exception to the general duty of care rule when a plaintiff is injured while voluntarily participating in a risky activity. (*Luna v. Vela* (2008) 169 Cal.App.4th 102, 108 [86 Cal.Rptr.3d 588].) Our Supreme Court has broken "assumption of the risk" into two categories: (1) primary assumption of the risk, which affects the duty analysis; and (2) secondary assumption of the risk, which affects the damages analysis. (*Shin v. Ahn* (2007) 42 Cal.4th 482, 489 [64 Cal.Rptr.3d 803, 165 P.3d 581].)

■ Primary assumption of the risk means that the plaintiff has voluntarily participated in a sport that includes various inherent risks, and therefore, the defendant is relieved of his or her duty to use due care to avoid the plaintiff suffering an injury as a result of those inherently risky aspects of the sport. (*Knight v. Jewett, supra*, 3 Cal.4th at pp. 308–309, fns. 3–4, 315–316.) The question of whether a defendant should be relieved of his or her duty is a question of law and policy. (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 161 [41 Cal.Rptr.3d 299, 131 P.3d 383].) A court must evaluate (1) the fundamental nature of the sport, and (2) the defendant's relationship to the sport, in order to determine if the defendant should be relieved of his or her general duty of care. (*Ibid.*) As a matter of policy, a duty should not be imposed where doing so "would require that an integral part of the sport be

abandoned, or would discourage vigorous participation in sporting events." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004 [4 Cal.Rptr.3d 103, 75 P.3d 30].) If the defendant is relieved of his or her duty of care, then the plaintiff's negligence cause of action is barred. (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1068 [68 Cal.Rptr.2d 859, 946 P.2d 817].)

■ Secondary assumption of the risk affects the damages analysis, rather than the duty analysis. (*Shin v. Ahn, supra,* 42 Cal.4th at p. 498.) In secondary assumption of the risk, the defendant owes the plaintiff a duty, but the plaintiff shares the fault for his or her injury, and therefore, the damages must be apportioned between the parties. (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 480 [63 Cal.Rptr.2d 291, 936 P.2d 70].) We begin our analysis with primary assumption of the risk.

### (1) *Fundamental Nature of the Sport*

In the present case, we must determine whether being crashed into twice by coparticipants is a risk inherent in the sport of motocross. (See *Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1633 [53 Cal.Rptr.2d 657] [framing the issue as determining "whether being cut by the blade of a fellow skater during a group skating session is, as a matter of law, a risk inherent in the sport of figure skating"].)

■ " ' "[I]t is thoroughly established that experts may not give opinions on matters which are essentially within the province of the court to decide." [Citations.]' [Citation.]" (*Staten v. Superior Court, supra,* 45 Cal.App.4th at p. 1635.) Accordingly, the legal question of duty, and specifically the question of whether a particular risk is an inherent part of a sport, "is necessarily reached from the common knowledge of judges, and not the opinions of experts." (*Ibid.*)

Motocross is a sport in which people ride motorcycles and perform jumps off of ramps, while in a setting filled with dust and other people on motorcycles. Given the racetrack setting, speed involved, and jumping maneuvers, it follows that coparticipants will fall down, and while down, be struck by other riders whose views are obscured by the blind corners, blind ramps, dust, and/or other riders. (See *Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 193 [43 Cal.Rptr.2d 392] [jumps and falls are inherent risks in BMX (bicycle) competitions]; see also *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264 [102 Cal.Rptr.2d 813] (*Distefano*) [collisions with coparticipants are an inherent risk in the sport of off—roading (dune buggies and motorcycles)].)

## (2) *Status of Defendant*

■ We now examine defendant's relationship to the sport. An owner/operator of a sports facility has a duty to provide a reasonably safe course or track. (*Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 134 [40 Cal.Rptr.2d 249].) This duty requires an owner or operator to " 'to minimize the risks without altering the nature of the sport. [Citations.]' [Citation.]" (*Ibid.*; see also *Kahn v. East Side Union High School Dist., supra*, 31 Cal.4th at p. 1004 ["minimize the risk without altering the nature of the sport"]; *Knight v. Jewett, supra*, 3 Cal.4th at p. 317 ["minimize the risks without altering the nature of the sport"].)

■ In the sport of motocross, an owner/operator of a track has a duty to minimize the risk of a coparticipant crashing into a second coparticipant who has fallen on the track. Providing a warning system of some sort, such as caution flaggers to alert riders of a fallen participant, would assist in minimizing the risk of riders colliding with one another. If a rider received adequate warning of a fallen rider on the track, then the rider could change his or her course to avoid the fallen rider. Further, providing a warning system, such as caution flaggers, would not alter the sport, because it would not prevent riders from jumping and traveling at high speeds; rather, it would provide the riders with information so that they could alter their course as necessary. ■ In sum, we conclude that the owner/operator of a motocross track has a duty to provide a warning system, such as caution flaggers, to alert other riders of a fallen participant on the track. Accordingly, we conclude that Dover owed Jerid a duty.

We find support for our conclusion in *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173 [119 Cal.Rptr.2d 497] (*Saffro*). In *Saffro*, the plaintiff ran a marathon organized by Elite. That same day, after completing the race, the plaintiff suffered a grand mal seizure. At the hospital, the plaintiff was diagnosed with hyponatremia, which occurs as a result of decreased sodium in the blood. Medical experts opined that the plaintiff's condition was caused by the lack of water and electrolytes consumed during the marathon. There was evidence that no water or cups were available at the first refreshment stand, located at the marathon's two-mile mark. The second refreshment station had a trash can filled with water, but no cups. The remaining refreshment stations had water, but nothing to restore electrolytes, such as Gatorade. (*Id.* at pp. 176–177.)

The plaintiff sued Elite for negligence and negligent supervision. (*Saffro, supra*, 98 Cal.App.4th at p. 177.) Elite moved for summary judgment, and the trial court granted the motion. The trial court found that hyponatremia is an inherent risk of running a marathon, and therefore the plaintiff's claims were

barred by the doctrine of primary assumption of the risk. (*Id*. at pp. 177–178.) The Court of Appeal noted that a race organizer has a duty to conduct a reasonably safe race, which means it must minimize the risks involved in marathon racing. It further reasoned that this duty included "the obligation to minimize the risks of dehydration and hyponatremia by providing adequate water and electrolyte fluids along the 26-mile course." (*Id*. at p. 179.) The appellate court concluded that providing adequate fluids and water would not alter the sport of marathon running. Accordingly, the court held that the plaintiff's claim was not barred by the doctrine of primary assumption of the risk. (*Ibid*.)

The appellate court's reasoning in *Saffro* is helpful in understanding the type of steps that must be taken to minimize the risks involved to sports participants. For instance, there is no duty to eliminate the risk of dehydration in marathon runners; however, there is a duty to minimize the risk of dehydration occurring by providing adequate refreshment stations. In a similar vein, there is no duty to eliminate the risk of motocross riders colliding with one another; however, there is a duty to minimize the risk by providing an adequate warning system.

Dover argues that the duty analysis in the instant case should follow the duty analysis in *Distefano, supra*, 85 Cal.App.4th 1249. In *Distefano*, the plaintiff and the defendant were engaged in the sport of " 'off-roading.' " (*Id*. at p. 1255.) The sport of off-roading takes place on "dirt trails or pathways that are ever changing due to unrestrained off-road vehicular activity and the forces of nature." (*Ibid*.) The plaintiff rode his motorcycle on a narrow, one-lane dirt trail approaching the crest of a blind hill, while the defendant, in a dune buggy, was ascending the opposite side of the same blind hill. The plaintiff and the defendant could not see one another as they approached the top of the hill, and ultimately the plaintiff and the defendant collided. (*Id*. at pp. 1255–1256.)

The defendant moved for summary judgment, and the trial court granted the motion. (*Distefano, supra*, 85 Cal.App.4th at pp. 1256–1257.) On appeal, the plaintiff argued that the defendant increased the risk inherent in the sport of off-roading, in part, by "failing to have another person act as a spotter on top of the blind hill to warn off-roading vehicles traveling up the same blind hill in the opposite direction." (*Id*. at pp. 1265–1266.) The appellate court held, "as a matter of law," that the defendant did not owe a duty to the plaintiff to use a spotter. (*Ibid*.)

We conclude that the instant case is distinguishable because *Distefano* concerned the duty owed by one participant to another participant (*Distefano, supra*, 85 Cal.App.4th at p. 1265), whereas the instant case addresses the duty

owed by the track owner to the participant. As explained *ante,* "the nature of a sport is highly relevant in defining the duty of care owed by *the particular defendant.*" (*Knight v. Jewett, supra,* 3 Cal.4th at p. 315, italics added.) The identity of the defendant is not meaningless—the duty owed by a coparticipant is not necessarily the same duty owed by the owner of the track. (*Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 563 [33 Cal.Rptr.2d 777].) In sum, we are not persuaded by Dover's reliance on *Distefano,* because *Distefano* involves a coparticipant rather than an owner/operator.

### (b) *Breach*

As set forth *ante,* to advance a claim for "gross negligence" the plaintiff must allege extreme conduct on the part of the defendant. (*Eastburn, supra,* 31 Cal.4th at pp. 1185–1186.)

After Jerid's initial fall, he proceeded to stand and pick up his motorcycle. Approximately 30 seconds later, a motorcyclist on the track struck Jerid. Approximately 20 seconds after that collision, a second motorcyclist struck Jerid. A caution flagger was not standing on the platform next to the location where Jerid fell; however, Jerid saw a caution flagger on the far side of the track from where he fell, and he saw the caution flagger run towards him prior to his being struck by the second motorcyclist.

In addition to Jerid's statements, the record contains the "Brett Downey Safety Foundation Instructional Manual for Caution Flaggers" (the Manual). The Manual provides: "Flaggers must remain at the flag station at all times when competitors are on the course." The general manager of the track declared that all of the caution flaggers at the track received training consistent with the Manual.

The record also includes the declaration of a motocross safety expert. The safety expert declared that the common practice for motocross tracks is to have caution flaggers at their assigned posts at all times, whether the track is being used for racing or practicing. The safety expert declared that the lack of a caution flagger at the platform near Jerid's accidents, was "inexcusable, a blatant disregard for riders' safety, and criminal." The safety expert also stated that not having a caution flagger on the platform "greatly fell below the standard of care and custom and practice established in the motocross industry."

 Based upon the foregoing evidence, at trial plaintiffs possibly could establish that (1) it is standard practice in the industry to have caution flaggers on their platforms at all times, based upon the Manual; (2) a caution

flagger was not posted on the platform near Jerid's fall at the time of the accidents, as stated by Jerid; and (3) the failure to post a caution flagger on the platform was an extremely egregious error, as declared by the safety expert. Based upon this evidence, plaintiffs have created a triable issue of fact as to whether the failure to provide a caution flagger constituted an extreme departure from the ordinary standard of conduct. Accordingly, we conclude that the trial court erred by finding that plaintiffs did not present a triable issue of fact related to breach.[4]

### (c) *Causation*

Next, we examine whether a triable issue of fact exists concerning the element of causation. We conclude that a triable issue of fact does exist.

"An actor may be liable if the actor's negligence is a substantial factor in causing an injury, and the actor is not relieved of liability because of the intervening act of a third person if [the] act was reasonably foreseeable at the time of the original negligent conduct. [Citation.] 'The foreseeability required is of the *risk of harm*, not of the particular intervening act.' [Citation.]" (*Anaya v. Superior Court* (2000) 78 Cal.App.4th 971, 973 [93 Cal.Rptr.2d 228]; see also *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1235–1236 [32 Cal.Rptr.2d 136].)

### (1) *Substantial Factor*

We begin our causation analysis by examining whether a jury could find that Dover's negligence was a substantial factor in causing Jerid's injuries.

After Jerid's initial fall, he proceeded to stand and pick up his motorcycle. Approximately 30 seconds later, a motorcyclist on the track struck Jerid. Approximately 20 seconds after that collision, a second motorcyclist struck Jerid. Given the time delay between the initial fall and the collisions, it is possible that plaintiffs will be able to show that if a caution flagger had been present, then the collisions could have been prevented. In other words, a jury could find that if a caution flagger had been posted on the platform, then the other two riders might have seen the caution flags and altered their course, so as to avoid striking Jerid. Accordingly, a trier of fact could reasonably find that Dover's negligence was a substantial factor in causing Jerid's injuries.

---

[4] The trial court did not make a specific finding related to breach; however, the trial court made a general finding about "gross negligence." The trial court found that the evidence presented by the parties "did not rise to the level of gross negligence as a matter of law."

(2) *Foreseeability*

Next, we analyze whether a trier of fact could conclude that Dover should not be relieved of liability—as a result of the two motorcyclists' intervening acts of colliding with Jerid—because the risk of the collisions was foreseeable.

As set forth *ante*, collisions are an inherent risk in the sport of motocross. Jerid testified that other motorcyclists were using the track when he arrived. Since crashes are an inherent risk in the sport of motocross, and multiple motorcyclists were using the track, a trier of fact could infer that collisions were more likely to occur if adequate caution flaggers were not provided. In other words, a trier of fact could conclude that the risk of the collisions was foreseeable. Accordingly, we conclude that a triable issue of fact exists on the element of causation.

(d) *Gross Negligence—Conclusion*

In sum, Dover owed Jerid a duty of care. Whether (1) Dover's conduct constituted an extreme departure from the ordinary standard of conduct; and (2) Dover's acts were a cause of Jerid's injuries, are questions of fact to be resolved by trial, not summary judgment.

(e) *Dover's Argument*

In Dover's respondent's brief, Dover writes that plaintiffs' complaint is "devoid of any allegation of gross negligence." At oral argument in this court, Dover conceded that gross negligence is not an independent cause of action that should have been separately pled by plaintiffs; however, Dover argued that the facts alleged by plaintiffs do not amount to extreme conduct. (See *Santa Barbara, supra*, 41 Cal.4th at pp. 780–781 [discussing the possibility of gross negligence being a separate cause of action]; see also *Continental Ins. Co. v. American Protection Industries* (1987) 197 Cal.App.3d 322, 330 [242 Cal.Rptr. 784] [holding gross negligence is not necessarily a separate cause of action from ordinary negligence].) We disagree.

When reviewing a grant of a motion for summary judgment, we must resolve every reasonable doubt in favor of the plaintiffs when looking at the complaint. (*B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823, 834 [64 Cal.Rptr.2d 335] [Fourth Dist., Div. Two].) To set forth a claim for "gross negligence" the plaintiff must allege extreme conduct on the part of the defendant. (*Eastburn, supra*, 31 Cal.4th at pp. 1185–1186.)

Plaintiffs' complaint alleges: "Only one (1) 'flagger' was present on the track at the time of [Jerid's] fall, but [the flagger] was not paying attention to

the track and failed to raise his flag which would have alerted other oncoming riders of an incident and to ride with caution." As set forth *ante*, the owner/operator of a motocross track has a duty to provide a warning system, such as caution flaggers, to alert other riders of a fallen participant on the track. It is possible a jury could find that providing only one caution flagger was an extreme departure from the ordinary standard of care. Accordingly, we conclude that plaintiffs did allege facts sufficient to constitute a claim of gross negligence. It is important to note that we are not passing judgment upon the merits of plaintiffs' allegations; rather, we are viewing the allegations in the light most favorable to plaintiffs, as required by the law. (*B.L.M. v. Sabo & Deitsch, supra*, 55 Cal.App.4th at p. 834.)[5]

### 3. *Conclusion*

The trial court correctly found that Jerid's claims for ordinary negligence and negligent hiring and supervision are barred by the Release. The trial court erred when it found that Dover did not owe a duty to Jerid, and that a triable issue of fact did not exist as to the claim for gross negligence.

### D. *Loss of Consortium*

The trial court granted summary judgment as to the loss of consortium cause of action due to loss of consortium being "derivative" of Jerid's negligence claims. Contrary to the trial court's reasoning, loss of consortium is not a derivative cause of action. While the cause of action is triggered by the spouse's injury, "a loss of consortium claim is separate and distinct, and not merely derivative or collateral to the spouse's cause of action. [Citations.]" (*Gapusan v. Jay* (1998) 66 Cal.App.4th 734, 742 [78 Cal.Rptr.2d 250].) Plaintiffs have not raised a separate argument regarding the loss of consortium cause of action; however, plaintiffs requested that this court reverse the trial court's judgment in its entirety. Since there was no specific claim of error as to the loss of consortium cause of action, we do not reverse the trial court as to this cause of action. (*Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1291 [286 Cal.Rptr. 198]; *County Nat. Bank etc.*

---

[5] At oral argument in this court, Dover cited *Booth v. Santa Barbara Biplane Tours, LLC* (2008) 158 Cal.App.4th 1173 [70 Cal.Rptr.3d 660], to support its argument. Counsel for plaintiffs had not been notified of the *Booth* case, and therefore was unable to respond to the argument. *Booth* involves a plane that lost power and made an emergency landing. (*Id.* at pp. 1175–1176.) In *Booth*, the appellate court found that the plaintiffs had alleged only simple negligence and breach of implied warranty in their complaint. (*Id.* at p. 1181.) The appellate court concluded that the causes of action were barred by the release signed by the plaintiffs, but that a claim of gross negligence or recklessness would not have been barred if it had been pled. (*Ibid.*) We do not find *Booth* to be persuasive because a factual allegation of extreme conduct in the context of airplanes is not comparable to factual allegations of extreme conduct in the context of motocross, as flying and motorcycle riding are strikingly different activities.

*Co. v. Sheppard* (1955) 136 Cal.App.2d 205, 222–223 [288 P.2d 880]; see also Cal. Rules of Court, rule 8.204(a)(1)(B).)

## DISPOSITION

The judgment is reversed as to gross negligence. In all other respects, the judgment is affirmed. The parties are to bear their own costs on appeal.

King, Acting P. J., and Codrington, J., concurred.